JAMES ALGER FEE
(dissenting).
This Court now allows a father and mother to take advantage of a unique opportunity to make extraordinary profits in a short time and pay the minimum taxes thereon by splitting with their three infant children the cash contributions to their business. These minors, aged, respectively, nine, seven and four at the time of the first partnership between Pike, Haney and McLeod, furnished no capital thereto and could not and the record shows conclusively at any time in question did not furnish any services to either of the partnerships. The contribution of services by the mother to the business, if there were any, stand on a par with the contributions of the father. The father and mother were vitally concerned that the business succeed. They were the taxpayers. The character of pseudo-trustee cannot prevail over that of taxpayer.
The findings of the trial judge, which are set aside in this case, while comprehensive, are explicit and direct. A transcript thereof is set out in the margin.[1] Each is supported by substantial *695 evidence. These findings are based upon the testimony of witnesses, which the trial judge heard in person. The appraisement of the underlying intent and purposes of the taxpayers who are vitally interested was made by the trial *696 judge, based upon the testimony of each which he heard in open court. Not only does this Court set these aside, but on a cold record it makes findings affirmatively that the contributions to the business through these trusts was in good faith and served a business purpose.
*697 “ * * * the parties to said agreements did not in good faith and acting with a business purpose, intend” to have the trusts or the taxpayer mother, “as trustee,” joined together “in the present conduct of the partnership,” is the key finding of . the trial judge. It is buttressed by the finding that the income was produced entirely by the services and contributions of the father and “the partnerships made no real change in the economic or financial status of the Pike family.”
It was for the trial judge to determine on the testimony before him “ * * * whether, considering
all the facts — the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other fact throwing light on their true intent — the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.”
This test is laid down in the Culbertson case, and, as the findings show, the trial judge took all the elements into consideration. The reversal here does not therefore come as a matter of law.
In the well reasoned opinion in the Harkness case, this Court says:
“In our opinion the court properly interpreted the Culbertson case, the essential determination of which is that the question there considered, and presented by the record here, is one of fact.” Harkness v. Commissioner of Internal Revenue, 9 Cir., 193 F.2d 655, 658.
The majority opinion seems squarely to abandon the principle there embraced. This case is not remanded as the Supreme Court remanded in the Culbertson case for a reconsideration of the fact questions.
In the face of the findings of fact of the trial court, this Court assumes the power to make diametrically opposite findings. It is always possible to glean from the record bits of testimony which, construed most favorably, point to a conclusion which might be reached if we were the triers of fact. But we are not.
“A careful review of the evidence and the exhibits affords no basis upon which we may substitute our interpretation and construction of the evidence for that of the trial court.” Summerbell v. Elgin National Watch Co., 94 U.S.App.D.C. 220, 215 F.2d 323, 324.
These findings are supported by substantial evidence.
We cannot hold, as the majority opinion seems to hold, that what would otherwise have been a breach of trust in appropriating these credits to the trusts for the payment of the debt of taxpayers is for the state courts and does not indicate that the whole transaction was a sham. This position amounts to a holding that the collusion of the settlors with the supposed trustee to apply credits of the trust for these children, to the liquidation of the debts of settlors, is irrelevant on the question of good faith in connection with taxes. The father and mother proved they had always considered the money earned by the trusts as their own by accepting a refund thereto and using the credits to square their own liability. Pike had an obligation to support his wife and children. These trusts were created upon the day the first partnership agreement was entered into. On that day, Pike put up all the capital. The mere fact that some of it came from the right hand pocket and he intended to put it into the left hand pocket if income was made upon it is immaterial. There was positive testimony from the other partners. This testimony shows that the true partners were the three, Haney, McLeod and Pike. Haney and McLeod were dealing with Pike. It was imma *698 terial to them from whence Pike got the capital which he put up. Since Pike already had the money, there was no necessity, business or otherwise, impelling him to put it in the three trusts. Thus there was no “business interest” of the partners, Haney, McLeod and Pike, which was subserved by putting the money first in the trusts and then into the partnership.
Now it is obvious that the income earned by Pike in the first partnership necessarily passed through Pike to his children. Haney, one of the partners, verified this and said definitely that the partners did not care how Pike divided the fifty per cent interest which he had. The income was allocated to the wife and three children after it was earned by and vested in Pike by virtue of an anticipatory assignment.
Thus it appears that there was no interest among the partners or in the partnership which dictated that Pike should take money out of his pocket and split it up in three trusts for the purpose of investing in the partnership. Any legitimate “business purpose” of the partners or the partnership would have been satisfied by investment of the money directly by Pike. The same is true about the distribution of the income. No business purpose of any of the partners or the partnership was served by payment of the money to the three trusts.
Pike did have a definite interest in both the setting up of the three trusts and the distribution of the income thereto. But Pike’s interest cannot be a “business purpose,” but rather an intensely personal motivation. The advantages were these: (a) The facts-show that Pike had control of the capital which was put in the partnership. Owning fifty per cent, he was in actual control. He also controlled the income after it was earned. The facts show he treated the money as his own after it had been paid into the trusts, (b) Pike was required to support his wife and children. This operation was providing for maintenance of the wife and for the future of the children, (c) If there were losses, he lost capital he already had earned, but, if there were gains, he still remained out of high bracket income taxes.
But none of this spells out any “business interest” in the transaction. Again, the trial court found that the setting up of the trusts was not in good faith. Although the setup was fair on paper, the retention of control vitiated the transaction. Pike should pay proper taxes, just as other individuals must. He should not succeed in “minimizing taxes” where the facts show he at all times treated the money as his own.
This Court flies in the face of the previous precedents when its judgment as to intent and purpose is substituted for that of the trial court.
The essential necessity of collection of the national revenue is in this instance frustrated. The public policy of equal burden to taxation on equal income is vitiated by this example.

. “I. These two civil actions (causes Nos. 14,560-WB and 14,561-WB), were instituted by Thomas P. Pike and Katherine Keho Pike against the United States. In each of said actions the plaintiff sought to recover Federal income taxes paid for the years 1945, 1946 and 1947. Thomas P. Pike sought recovery ©f $22,-916.59 plus interest and Katherine Keho Pike sought recovery of $25,538.42 plus' interest. The defendant in its answers in these causes put in issue the rights of the plaintiffs to recover any of the amounts sued for in their complaints. The two actions were consolidated and tried together by agreement of the parties.
' “II. . The sole issues presented in these cases are whether during the years 1945, 1946 and 1947, Katherine Keho Pike, acting in her capacity as trustee of each of three trusts created by Thomas P. Pike for their three minor children, was a bona fide partner with Thomas P. Pike, Norman A. McLeod, H. G. Haney and Katherine Keho Pike in her individual capacity for Federal tax purposes in the operation of an oil well drilling business under the name of ‘Pike and Associates’ in Southern California; and whether during said years Katherine Keho Pike in her capacity as trustee of said trusts was a bona fide partner with Thomas P. Pike, H. G. Haney, Norman A. McLeod, Stanwood I. Williams and Katherine Keho Pike in her individual capacity for Federal tax purposes in business of the operation of certain oil wells in Southern California under the name of ‘Thomas P. Pike, Operator.’ Plaintiffs contend that Katherine Keho Pike, as trustee for each of their three minor children, was a partner in each of these businesses, to the extent of 10% for each child’s trust in Pike and Associates and originally *695 12% for each child’s trust in Thomas P. Pike, Operator, which share was later increased to 17.04%, which contention is denied by the defendant. The defendant ■contends that the shares of income from said partnership claimed by Katherine Keho Pike, as trustee, should be divided equally between the two plaintiffs on the ground that each owned a community share in those portions of the partnership incomes.
“III. Plaintiffs, Thomas P. Pike and Katherine Keho Pike, are now and during the tax years involved, were husband and wife who lived together in Los Angeles County, California, within the jurisdiction of this Court. They have three children. John Keho Pike was born July 31,1984; Josephine McCormick Pike on April 22, 1937, and Mary Katherine Potter Pike on February 20, 1940. These children resided with their parents ■during the taxable years here involved.
“IV. Thomas P. Pike was president ■of Thomas P. Pike Drilling Company, a •corporation, which had been organized in 1938. The corporation had 305 shares of stock outstanding on February 8, 1944, of which these plaintiffs owned 61 shares ■outright and Katherine Keho Pike held an additional 21 shares as guardian for their three children. Said shares had been given to the children by Thomas P. Pike in 3941. H. G. Haney owned 15 ■shares of the stock, and Norman A. McLeod owned 5 shares. Thomas P. Pike Drilling Company was, from the date of organization to the time of the trial, engaged in drilling oil wells for hire with drilling rigs which it owned. Thomas P. Pike, II. G. Haney and Norman A. McLeod were the actual managers of Thom:as P. Pike Drilling Company. Drilling ■crews were hired by them. Katherine Keho Pike was on the Board of Directors of Thomas P. Pike Drilling Company, served as Vice-President for a few months, was Secretary for it at one time, and its Treasurer for six or seven years, .■and her name was on the corporation’s •bank signature card for a long period of ■time. She was never paid a salary for any services rendered the corporation.
“V. A partnership agreement creating the firm of ‘Pike and Associates’ was ■ executed on February 8, 3944, by Thomas 1*. Pike, Katherine Keho Pike, Norman A. McLeod, II. G. Haney and Katherine Keho Pike as trustee for each of the three Pike children who were then aged 4, 6 and 9 years, respectively. Thomas P. Pike and Katherine Keho Pike wished to build up an estate for their children. To this end Thomas P. Pike, as trustor, and Katherine Keho Pike, as trustee, executed throe declarations of trust, one for each child, on February 8, 1944. On February 8, 1944, Thomas P. Pike gave $2,000.00 in the form of a check to each of the three trusts. On February 10, 1944, Norman A. McLeod and H. G. Ilaney each contributed $10,000.00 in cash to the capital of Pike and Associates. The following day Thomas P. Pike and Katherine Keho Pike each contributed $2,000.00 in cash to that partnership. On February 21, 1944, Katherine Keho Pike, as trustee, contributed the sum of $2,000.00, derived from the proceeds of the check given her by Thomas P. Pike on February 8, 1944, to the capital of Pike and Associates on behalf of each trust.
“VI. The partnership of Pike and Associates was in existence from February 8, 1944, until February 15, 1946. It was engaged in the same business as Thomas P. Pike Drilling Company. The businesses were conducted in the same manner with the exception that Pike and Associates drilled oil wells with rigs rented from other persons whereas Thomas P. Pike Drilling Company generally drilled with rigs which it owned outright. Thomas P. Pike, Norman A. McLeod and H. G. Haney were the actual Managers of Pike and Associates as they were of Thomas P. Pike Drilling Company. Katherine Keho Pike rendered no services in the conduct of the business of Pike and Associates. Thomas P. Pike, Norman A. McLeod and H. G. Haney each devoted half of their time to the conduct of the business of Pike and Associates.
“VII. Pike and Associates was formed because there were ‘flush’ times and a chance to make some money, but it was not known how long the opportunity would exist. Thomas P. Pike Drilling Company was unwilling to put out the capital necessary to buy the additional drilling rigs necessary to conduct this additional business. Pike and Associates realized a net income of $299,750.50 during its existence. One-fourth of this income went to H. G. Haney, and a like amount to Norman A. McLeod. Thirty per cent of the partnership income was reported by Katherine Keho Pike as trustee for her three children (10% for each trust) for Federal income tax purposes. The remaining 20% of the partnership *696 income was reported for Federal income tax purposes by Thomas P. Pike and Katherine Keho Pike in their individual capacities. The Commissioner of Internal Revenue taxed the 30% of partnership net income reported for the trusts to Thomas P. Pike and Katherine Keho Pike in their individual capacities.
“VIII. On August 31, 1944, a partnership agreement was executed by Thomas P. Pike, Katherine Keho Pike, Norman A. McLeod, H. G. Haney, Stanwood I. Williams and Katherine Keho Pike as trustee for each of the three minor children of herself and Thomas P. Pike, which created the firm of Thomas P. Pike, Operator. The capital contributed to this partnership came from the profits of Pike and Associates. The firm of Thomas P. Pike, Operator, engaged in the business of owning oil wells. These wells were drilled by Thomas P. Pike Drilling Company. On July 31, 1946, Thomas P. Pike, transferred and assigned all his interest in said partnership to Katherine Keho Pike and three trusts in equal shares and thereafter a new partnership agreement was executed among the remaining partners.
“IX. Partnerships (Pike and Associates and Thomas P. Pike, Operator) used the same office as Thomas P. Pike Drilling Co., and the same office personnel and equipment. At the end of each month in which the partnerships operated all the general and administrative expenses of Thomas P. Pike Drilling Co., and expense of maintaining its Long Beach yard were added together and Pike and Associates was billed by the corporation for its share determined upon the basis of the number of rig operating days the partnership had during said month as compared to the number of days the corporation had. These overhead charges included salaries to all of the partners with the exception of Katherine Keho Pike who received no salary from any source. The partnerships paid Thomas P. Pike Drilling Company the amounts for which they were billed.
“X. Katherine Keho Pike rendered no services to Pike and Associates or to Thomas P. Pike, Operator, the two partnerships.
“XI. Thomas P. Pike borrowed $14,-000.00 from each of the three trusts created for his children. This money together with a credit for overpayments of income taxes overpaid by the trusts in the sum of $15,837.51 was used by Thomas P. Pike arid Katherine Keho Pike to pay their personal Federal income taxes. Thomas P. Pike borrowed from the trusts on his own unsecured note at an interest .rate of 2% per annum. He borrowed $2,000.00 from each trust with which to pay California personal income taxes of himself and Katherine Keho Pike. He borrowed $3,334.00 from each trust with which to buy Christopher Oil Company stock for himself. Shortly before the trial of these actions these loans had been repaid. No arrangement had been made to repay the trusts for the credit of their own overpayment of income taxes which had been applied toward payment of the deficiencies in income taxes of Thomas P. Pike and Katherine Keho Pike.
“XU. During the years 1945, 1946 and 1947, the income of the three trusts for the Pike children from the partnership businesses of Pike and Associates and Thomas P. Pike, Operator, was produced entirely as a result of the personal services and contributions of the plaintiff, Thomas P. Pike, neither Katherine Keho Pike nor the children having contributed services nor capital for the production of said income.
“Xin. All of the share of the income from the partnership businesses allocated to the trusts for the Pike children was earned by Thomas P. Pike and the partnerships made no real change in the economic or financial status of the Pike family.
“XIV. That considering all of the facts — the partnership and trust agreement, the conduct of the parties thereto in execution of their provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of the income allocated to the trusts for the Pike children and the purposes for which it was used and all other facts throwing light on their true intent, it is found that the parties to said agreements did not in good faith and acting with a business purpose, intend that Katherine Keho Pike, as trustee, should join together with them in the present conduct of the partnership enterprises known as Pike and Associates and Thomas P. Pike, Operator.”